The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention to the court is now sitting. God save the United States and this Honorable Court. Please be seated. Alright, we are pleased to have all of you here today and we'll begin with Kimberly Polk v. Montgomery County Schools. And Mr. Klaber, whenever you're ready, sir. Thank you, Your Honor, and good morning to you all. I want to ask everybody to speak up and that's not because your voices are too low. It's just because my hearing is not what it should be. I'm right with you. I've got my hearing aids up all the way, but sometimes I still don't hear very well. So we will speak up. And this morning, I'd like to focus on two ways in which the U.S. Supreme Court's decision in Mahmoud v. Taylor this past June relates to Ms. Polk's free exercise and free speech claims. I've got some questions about jurisdiction. How do we have jurisdiction here to consider the merits of those constitutional claims? You're not here on a final order. Wait, this is an appeal from a district court case. You're not here on a final order. We're here on a denial of a preliminary injunction, Your Honor. You are. So that provides our jurisdiction. And after discussing Mahmoud, I'd like to bring to this Court's attention some other recent developments in the Supreme Court that are relevant to this case. Let me take free exercise first. And that aren't in anything that you've filed with the Court so far? We filed a supplemental. Okay, so that's what you're going to talk about. Yes. I just want to make sure the opposing counsel in the Court isn't unfairly surprised by what you're about to argue. We filed a supplemental authority letter on Mahmoud, and they responded to that, Your Honor. But that Mahmoud was decided in late June, which is after our briefing was totally completed in this case formally. But the injunction was only denied under the judge's opinion on the Title VII claim. Yes, the Title VII claim is still there. The Title VII claim, and that's what I'm getting at. And how do we get to the merits of the constitutional claim on a preliminary injunction appeal? You do have a preliminary injunction appeal. That's what it is, right? 1292A1, I think. And we're not raising the Title VII issue, which the district court did not raise. The judge talked about denying the injunction on the Title VII claim and dismissed the merits without prejudice. Yes, but she dismissed the order. But on the injunction, they only have to assess the likelihood of success. Yes, but she dismissed it without prejudice. Without prejudice. That's right. And denied the injunction on the basis of lack of irreparable harm as to the Title VII claim. It's the way I read the judge's opinion on page 3839. Right, she's not. Of the opinion. Right. So that's what I'm concerned about. I just want to alert you. You can argue however you want. But I'm concerned about whether we have jurisdiction to assess the issues that you want to argue about. Right, but she said that we had no claims. She dismissed the claims with respect to free speech and the free exercise claims. And that's what we're appealing here. Now, on the free exercise. Well, the injunction of the denial thereof would go to the whole law, would it not? I'm sorry, I didn't catch it. The injunction of the denial of an injunctive relief would go to the whole law, would it not? Would go to the whole law? If the whole law was valid or whether it was not valid. Yes, the policy we're talking about, yes. It would go to the parts of it that Ms. Polk has objections to. And for the reason she was fired. She said she wouldn't follow them. Am I? With respect to the free exercise claims, would we be jumping a little bit ahead of the Supreme Court if we indicated your position on free exercise? Well, that's part of what I want to talk about. The Supreme Court has given you another issue to decide. Because in Mahmoud, they said they were confronted with the Smith defense. The district court denied the free exercise claim here because she said that Smith's rule saying that there's no free exercise violation if we're dealing with a law that is neutral. This is a law that makes no reference to religion at all. Based on its base, it seems perfectly neutral. And that will be covered by employers, division versus Smith. I realize that there have been a number of justices that have expressed reservations about that decision. But it hasn't been overturned. We think it's very clear that under Lukumi and other cases that have discussed the Smith case that you have to decide, well, even though it's neutral in its base, is it really targeting religious action? And I think that's very clear here. You say that repeatedly in your brief and now today that it's very clear that it's targeting religious action even though the word religion appears nowhere in it. So it's not very clear to me that it's targeting religious action. How do you make that argument? Well, you can use common sense. Apparently I have none because it's not very clear to me. Well, the Supreme Court says, you know, you can know whether something is targeting religion. You brought up Lukumi as a way to know whether something is targeting religion. In that case, it's much different than this one because there were comments by the lawmakers disparaging the particular religion that was targeted and the ordinance itself was focused at animal sacrifices versus all animal killings and things like that. There's nothing of the sort here. If there is, I'd be happy for you to point me to it in the record. No, there's not. But on the other hand, it also says in those cases you have to look to see if it really is targeting religion and if religion is predominantly affected by this regulation. How is religion predominantly affected by this regulation? Well, you can take a look at Mahmoud itself. It was brought by parents of different faiths, all traditional religions. You're assuming, I think, that only people of faith might have any issues or concerns with the ordinance. I mean, there could be secular reasons why people would have concerns with the, I'm sorry, not ordinance, with the policy. And I don't challenge that at all, Your Honor. But it's also true that it's predominantly affecting... Based on what in the record? Well, I'd refer you to the Bates decision or the Ninth Circuit reason. No, but in the record of this case. I don't have a statement that says it's based on religion. And religion is not stated, as Judge Wilkinson said. But in following Judge Thacker's question with respect to this, the law on its face is perfectly neutral. And it makes no reference to religion at all. And it covers issues that are secular as well as sectarian. It's a generally applicable law. And it made me a little bit nervous because the Supreme Court, although several justices have indicated an uneasiness with Employment Division v. Smith, they haven't overruled it. And until the Supreme Court overrules it, it's not our job to jump out in front of the Supreme Court and knock it down on free exercise grounds. It's possible that your free speech claim was the more interesting one. And I was surprised that you led with the Employment Division v. Smith and didn't talk about the free speech claim. Why don't you talk about that? We tracked what the district court did, Your Honor. But I will talk about that. But I do want to also point out that, first of all, we do not agree that this is generally applicable. It was discretionary judgments that school districts can use, which brings it under the Fulton Rule. We discussed that in our briefs. But also I want to point out that Mahmoud gives you another issue that you have to decide because the school district in Mahmoud also brought Smith as a defense. And the Supreme Court said, listen, when a law is like Yoder, Yoder was distinguished in Smith, and so Smith doesn't apply and doesn't even have to be considered. So the operative language in Mahmoud is when a law imposes a burden of the same character as that in Yoder, strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable. So applying that here, Yoder is up in the education of the children. I think the concern that we're having, and I don't think you're picking up on it, is that people for very secular reasons that have nothing to do with religion can take one view or another with respect to issues surrounding transgender status. And that's very significantly a secular debate. And so... I don't second-guess or denigrate that, Your Honor. But the point I'm making is Mahmoud says you don't even have to think about those issues if this is a case that's like Yoder. And we think it is like Yoder all the way down the line. We're dealing with education of children. We're dealing with parents who disagree about how the school district is treating their children and what they're teaching them. Did she bring this lawsuit as a parent? She brought it as a teacher, Your Honor. All right. So what standing does she have to assert some parental right argument? She has standing because she is refusing to lie to the parents about what's happening at school. And you use lie repeatedly in your briefs, too. Just like the word religion is nowhere in this policy, neither is the word lie. And if it is, please show me. The policy does not use the word lie, but it's telling the teachers to mislead parents about what is happening at school. And it also does not use the word mislead, does it? It doesn't use that word. It says don't tell them. Keep it secret. No, it doesn't use the word secret either. It uses confidential information for the safety of the child if the child is in a home that is unsupportive. That's correct. Is Appellant unconcerned with the safety of the students in her classroom? Of course she is. Well, so then that's what this policy is about. That's what it says right at the beginning. What's happening here is that the school district is deciding what's in the best interest of the children instead of the parents and telling teachers not to tell parents what is happening. Apparently Appellant is trying to decide what's in the best interest of the students rather than the parents or the school board. No, that's not what's happening, Your Honor. That's what it sounds like based on your argument. And Judge Wilkinson tried to direct you, I think, attempted to direct you to your second argument about her First Amendment freedom of speech argument. You don't have much time left at this point. Would you like to address that? I will. Thank you, Your Honor. Mahmoud also relates to the free speech. And, of course, the school district claims that this falls under the Garcetti rule for government speech. And we explain why it does not. But Mahmoud is relevant to one of those reasons in particular, and that's the statement in Garcetti, reinforced by the Supreme Court in Janus, that the government can't compel the speech of employees for an unlawful or otherwise inappropriate purpose. In Mahmoud, the Supreme Court found that the school district using LGBTQ affirming books with kids was unlawful if done without the parents' knowledge and consent. How much more so here? The school district here has ordered Ms. Polk to conspire with it to hide what's happening in school from parents with respect to how their own child is named. If we were thrown into the Pickering balance, which I know you want to move past Garcetti and into Pickering, wouldn't the school district still have an interest in protecting a child from bullying by one's classmates? That's a significant state interest in this instance. And the state is contending that by not calling attention to gender identity or whatever, or using the students' preferred pronoun, that they are protecting the student from harassment and bullying by one's peers. Is that not a legitimate state interest? It's just not an interest that's involved in this case, Your Honor, because Ms. Polk certainly is not going to be involved in bullying. She said she'd stop any bullying that she found or saw that occurred. And she's going to treat the children respectfully. So it's just not an interest that's involved here. Unless respect includes using their preferred pronouns. Except for, I'm sorry, Your Honor, one more time. Unless respect includes using their preferred pronouns. That's correct. She'll use their preferred name, but she will just not use the pronoun. Well, what if a student is biologically female and the student's preferred name is Robert? She says she'll use it because nicknames are, it doesn't violate her religious beliefs. But calling her he is a problem for her. All right. My time is up. I did want to mention some recent Supreme Court developments that are relevant, but I can put that to the side for now. Do you have any questions? We're fine. We're fine. Thank you. We have some more time. Ms. Mitchell, we're happy to hear from you. Good morning, Your Honor. This is an appeal from the denial of a preliminary injunction on two constitutional claims. The question before this Court is whether the district court abused its discretion. It did not. On the free speech claim. What about the jurisdiction? What do you say about that? Your Honor, at the end of the. . . It's an interlocutory appeal. That's correct. There's no final order. Our understanding is that plaintiffs have appealed the denial of their preliminary injunction. At the end of Judge Bordman's order, she did deny the preliminary injunction in full. So that's our understanding of the basis for the plaintiff's appeal. But we agree there is still the Title VII claim proceeding below in the district court. That's an appealable issue. I mean, a denial of a preliminary injunction. We've got an appealable order. And I understand that on this issue, rather than go through a bunch of hoops, you'd like to have some kind of judgment on the constitutionality of the law so it can be settled. That's correct, Your Honor. The school district is prepared to make argument on the constitutional claims it issues. The school district needs to know, and the parents need to know, and students need to know, and teachers need to know. There are a lot of people, whichever way we come down, that the Supreme Court would like to know, rather than kicking the can down the road indefinitely. That's correct, Your Honor. Although we would say this is only an appeal of the preliminary injunction finding. So to the extent the court can make a decision based on that standard of review, rather than the motion to dismiss standard, and Ms. Polk is free to raise an appeal of that motion to dismiss decision. So the issue is likelihood of prevailing on the merits, not the merits itself. That's correct. Yes. Because this is only an appeal of the denial of the preliminary injunction, not the motion to dismiss decision itself. And the district court didn't specifically rule on the likelihood of prevailing on the merits. That's correct. The district court's decision addressed the motion to dismiss first, but then in the end said because it found the claims could be dismissed, it would deny the preliminary. So you're saying that addressing the merits necessarily encompassed ruling on the likelihood of prevailing on the merits. I think that's correct. And there's precedent, even in our circuit, for addressing issues like this that are inextricably intertwined with the issues relating to the injunction. So that might be the basis that you'd want to think about. The jurisdictional hook, nobody addressed the jurisdiction, I don't think, in the briefs. You talked a lot about the Constitution and the free exercise claim and the free speech claim. But just assumed, I think, everybody that you could address any issue you wanted to. But it's an interlocutory injunction appeal. That's correct, Your Honor. I think because of the procedural posture of this case, Ms. Polk's burden here is harder than it would be if she were appealing on the motion to dismiss. I'm happy to address either claim first. But starting with the free speech claim, a teacher's interactions with her students and their parents involves only speech made pursuant to her official duty. Let me ask you something with respect to Garcetti. If it's a curriculum matter, you have a stronger case for the application of Garcetti. But how can this be seen as a curricular matter? I mean, it seems to me if you're teaching a physics class and you started talking about the nation's history of systemic racism or something, that when something goes off track or you tell people how to actually teach physics, that's a curriculum matter. But how is this a curriculum matter? Because if it's not a curriculum matter, then the applicability of Garcetti is less clear. Your Honor, I'd say two responses to that. First of all, teachers do more than teach curriculum. I think if we're talking about what a teacher's responsibilities are in the classroom, that certainly intends to teaching particular subject matter. It also extends to classroom management. So it's a curriculum matter simply because it's in the classroom? I don't think we have to go that broad. But we can look to this court's decisions in Boring and in Lee, which discussed the breadth of what curricular speech is. And in those cases, this court said that curricular speech included any speech in the classroom that was intended to convey some sort of message. I think certainly on the preferred pronoun side of this policy, Ms. Polk believes that she's being required to convey some sort of message. The court's decision in Lee talked about how bulletin board materials covering religious topics was, in fact, intended by the teacher to convey some sort of message. And as a result, the school could control that speech. Let's suppose you're able to move past Garcetti and that we're in a Pickering balance kind of situation. And I understand what the state interest is in this situation. When we're talking about transgender status, we're talking about a constellation of very sensitive matters. I think we would all agree, however we feel about those issues, that when we're talking about participation in sports and we're talking about bathroom issues and we're talking about treatment of minors and counseling and everything, they are hugely controversial issues about which people of good faith and the like may legitimately have different views. I know people that have one view think maybe the other view is not in good faith and vice versa. But perhaps we can agree that people take positions on these issues that reflect genuine and decent values on both sides of the equation. And I wonder, in a matter on which the public is so deeply divided, whether it is appropriate for the state to require MS Polk to convey, through pronoun usage or lack thereof, its preferred message on transgenderism. I wonder if this can be seen as a matter of compelled speech on very sensitive topics. And when we're talking about compelled speech, you're raising all kinds of red flags under the First Amendment. So address the question of whether this is not compelled speech on a very sensitive issue and why they're not requiring MS Polk, through the use of certain pronouns, to convey the state's desired message. Your Honor, we don't believe whether this is compelled speech or not has any import in this discussion. Teachers in the public schools are required to provide certain messages to students all the time, sometimes messages they disagree with. There are decades of cases of teachers asking not to be required to teach evolution in school, for example. But courts have unanimously said the school board gets to decide what's taught in the classroom, what messages are provided to students in the classroom. And as a result, there's no First Amendment right attaching here at all. There's simply just no distinction that makes sense in the workforce, in the classroom, about what is compelled speech or not. Why isn't her request to just use the students' names, even if they are not, even if it's Robert when the person is biologically born female? What is the response to that? Why isn't that sufficient? Well, Ms. Polk says in her briefs that this is a neutral solution that everyone should be able to get behind. But that's not actually what her declaration said. She said she would use nicknames for everyone, but she would not use pronouns for transgender and gender nonconforming students. So not everyone would be treated equally under her proposed accommodation? That's correct. Her proposed accommodation would be treating students differently. That's at odds with the school. Why wouldn't the proposed accommodation work? Because you can refer to someone by their last names, which doesn't move one way or another with respect to these sorts of issues. And a lot of the teachers, when I misbehaved in class, which was more frequent than my parents wished, they would refer to me and say, Wilkinson, snap out of it, or Wilkinson, go sit in the corner, or whatever. And they would always refer to me by my last name. And so I'm wondering, that seems to me a reasonable sort of alternative that Ms. Polk has suggested. And why wouldn't that make everybody happy? Well, Your Honor, Ms. Polk has not suggested that accommodation. That accommodation has come up in some other cases. But all Ms. Polk has asked for below here was to be able to use preferred names and then to not use pronouns. The school board believes that is treating students differently based on their transgender status. But in any event, we don't believe this question of whether the accommodation was reasonable is actually an issue here at all. Because it would perhaps highlight transgender students as being different from everyone else in the classroom in the way the teacher is treating them. That's correct, Your Honor. But in any event, the question of whether the accommodation would be reasonable is only an issue with respect to Ms. Polk's Title VII claim. That claim is proceeding before the district court. At issue here is whether the school board has the ability to control the speech that's happening in the classroom as part of Ms. Polk's job duties. And that's all that's at issue here. There is no First Amendment right attaching to this speech. And the school board is well within their rights So what is the limiting principle that you have? I mean, is the school board free without limits to put words into a teacher's mouth just because this is secondary education rather than higher education? And admittedly, in a secondary setting, the school board has a greater latitude. I understand that. But are there no limits at all to the ability of the school board to put words in a teacher's mouth? Your Honor, I think this goes to Ms. Polk's argument resting on Janice. She refers repeatedly to the sentence in Janice talking about how an employer may insist that the employee deliver any lawful message. That part of Janice is citing to Garcetti. And what Garcetti tells us is that there are many other sources of law that could protect the government employee in that instance. There are whistleblower laws. There are codes of professional conduct. There are other sources of law that could defer an employer from making an employee say something unlawful or wrongful. But Garcetti then is clear. The First Amendment is not the protection in this case. Garcetti says, We reject the notion that the First Amendment shields from discipline the expressions employees make pursuant to their... If it's not in curricula, wouldn't the First Amendment provide some protection? Again, Your Honor, I believe... If it's not in the curriculum, wouldn't the individual interest strengthen? Again, the role, especially of elementary and secondary school teachers, goes beyond just teaching the curriculum. It also deals with classroom management. It deals with many other tasks that happen in the classroom. And doesn't Garcetti address what teachers are doing pursuant to their official duties and interacting with the students in whatever capacity in the classroom? They're only in that classroom pursuant to their official duties, correct? That's correct, Your Honor, and Garcetti is a very good example here. Garcetti was a teacher, and the issue there was the teacher was writing a letter expressing their own opinions about school budgeting issues. The court said, you know, look, they may have learned things about these school budgeting issues based on their role, but they're engaging in the public discourse. That discussion is outside the scope of their official duties. Well, there may be administrative duties, and that may be covered by Garcetti, but a lot of those administrative duties that you are alluding to do not relate to an issue of such volatility on which people of good faith can take different views. This is not simply an annual issue. It's not a matter of administrative duties or whether you put the crowns on one cabinet or another or how you arrange the students' seating or whatever. I mean, I take your point that there are administrative duties that the state requires maybe all the time, but on the other hand, there are lots of claims that fall well below or are much less strong than this one is. Your Honor, my response to that would be that contentious issues come up in school classrooms all the time. That's why this Court in Lee and in Boring has said we allow the school district to decide what the content of those communications may be. Public school education is often compulsory. We don't want to subject students to the idiosyncratic views of individual teachers. There has to be some sort of backstop. That backstop is a democratically elected school board, and that school board gets to decide what kind of messages are communicated in classrooms. There are plenty of cases where a teacher said a stray comment about how they were against the war or some other contentious issue in public life, and courts have always said the school is fine to just say teachers shouldn't be expressing their own private opinions on these kinds of issues. That's just a decision for the school board. Now, opposing counsel argued that Mahmoud supports appellant's position for a number of reasons. He went over. Do you have a response to that? Sure. On the free exercise claim in particular, Mahmoud says in most circumstances Smith applies. That is the case here. Smith applies. This is neutral and generally applicable, especially on a preliminary injunction standard. Ms. Polk didn't put in any evidence suggesting that this was not neutral and generally applicable. Suppose a school board passed a law maybe in a class on the history of racism in America. Could a school board, and a teacher wants to say segregation is a great ideal, and the school board understandably finds that appalling. Does the school board have power to say that, for example, a teacher must say, and that's put in a different way, a teacher must say affirmative action is a great idea or I hate affirmative action. Can the school board say what the teacher is to say on those issues? Yes. I think courts have been almost unanimous in saying that school boards can control what content is being taught, and they can also say teachers shouldn't be sharing their own personal views on these particular topics, especially in the elementary and secondary school context. I'm not aware of any courts that have said otherwise. There are clearly different issues, an issue in the college-university context. How can you teach a course on affirmative action when that can mean that it's either a good or a bad idea? Well, I think you could present whatever the curricular material is on that matter. You could engage in a classroom debate on that matter, but as a teacher, you could simply not share your own views of that matter. Can a school board say to a teacher you are required to say that affirmative action is a good idea or affirmative action is a terrible idea? Could a school board actually require that a teacher at the end of the class say affirmative action is an abhorrent idea or affirmative action is a wonderful idea? I think it would be a more difficult question if the school board was asking a teacher to affirm their own personal beliefs, but not about teacher's personal beliefs. Why is that any different from this case? The school board is not requiring Ms. Polk to say anything about her own beliefs in the classroom. It's simply requiring her to use students' preferred pronouns, and it's simply requiring her to keep student gender identity common. I'm just concerned about how far the school board, I mean, we all find segregation of heart, that racial integration is necessary to the welfare of this country, and that's, I think, a general need. But there are other issues like affirmative action where there are just very different views, and if we have these issues, and I would say affirmative action is one, and transgender status, and there's a constellation of issues around it, or another, does the school board just have unfettered power to put words of a specific kind in the mouth of the school teacher and require the school teacher to mouth those words? Your Honor, I think the school board does have a lot of power in saying what is taught. No, but I'm telling you, I'm asking you specifically, does the school board have the power to say to a teacher that a teacher must say affirmative action is an abhorrent idea or affirmative action is a very desirable idea? I don't think the school board could require a teacher to affirm their own beliefs in those things, but I think they could require them to provide a particular message as to a particular topic. Again, that's not the issue here. Ms. Polk is not being required to say anything about... You say it's not the issue here. Why isn't it the issue here? The issue here that we're talking about is compelled speech in the classroom on issues of high interest, high public interest in a democracy and an issue in which people of good faith take different views. What's the difference? Your Honor, the school board is not requiring Ms. Polk to say that she agrees with this policy, that she thinks that transgender students' preferred pronouns should be used. So she's free to say whatever she wants in her letters to the editor or any other context outside of the classroom. The school is only asking that she treat all of her students according to the guidelines, and that is within the school's prerogative and it's in the school's interest. If we refer to everybody by their last name, isn't that treating all students equally? But that is, again, not what Ms. Polk has asked for in this case. You just call them by their last name. Everybody's being treated equally. That may be an accommodation she could have requested. It is not the accommodation she requested in this case. You're talking about a fairly small minority of teachers that would raise this sort of concern. I would imagine that most teachers would find it perfectly congenial. If we're only talking about a very small number of people, does that weaken the state's interest? You can have, in most cases, a situation of teachers who want to comply. Your Honor, that might tie into the Title VII analysis that the district court will have to do in the first instance as to what kind of accommodations the schools could or should offer to their teachers, but that's not an issue here. The issue here is whether this is speech pursuant to Ms. Polk's official duties. It's whether these policies are neutral and generally applicable, and Garcetti and Employment Division v. Smith tells us there's no protection for Ms. Polk's speech. Is it relevant here that this is a substitute teacher? It's very relevant here that this is a substitute teacher. There are certainly interests that the school district has with respect to all of its teachers, but it certainly has an interest in saying that, you know, Ms. Polk should not be the one that's having these difficult conversations with parents. Ms. Polk should not be the one who is deciding how to call students in a particular way if she's only coming into the classroom for one day. Ms. Polk was a substitute teacher in the Montgomery County Public Schools for 10 days in eight different schools. The school has many interests, but it certainly has an interest in channeling difficult conversations to people who have more context, to administrators, and to ensuring continuity for the students. So that would certainly be one way to address this case. Ms. Polk is a substitute teacher. This is a special case, and she should not be able to insert herself into difficult conversations based on one day of knowledge of a student. Is it relevant here that they're seeking a mandatory injunction rather than a prohibitive injunction? We think the school board should win under both standards, but it is relevant here. Ms. Polk... Well, with a mandatory injunction, there's a greater burden. That's correct. A substantially greater burden. We got a recent case on that. That's correct, and Ms. Polk, the sort of status quo ex ante we're looking at is the summer before she was teaching. She was required to complete training and affirm her compliance with the guidelines. She didn't do so. That was the status quo, and that's what she's trying to upset, so yes. Well, Judge King makes a very interesting point. Why wouldn't this be a mandatory injunction? We're requiring you to use certain pronouns. That seems pretty mandatory to me. Well, Your Honor, I think the question is whether the status quo as it existed... Which status quo is she trying to go back to? And I think the position that Ms. Polk was in before she brought the case was that she was prohibited from teaching because she wasn't going to complete the training, affirm compliance with the guidelines. So she's asking that the school board change its policies from that point and allow her to continue teaching. Thank you very much. You have some rebuttal time, Mr. Claybrook. Thank you, Your Honor. And no, Ms. Polk is not mandating that... trying to get a mandate that the school district do anything. She's trying to get it to prohibit the school district from taking action against her. Now, let me address the Garcetti point. Garcetti says, of course, that not all speech within the office is automatically exposed to restriction by the government employer, and that the speech to be government speech that the government may control, it must be speech that the employer itself has... Well, there are some circuits that have taken... that Garcetti doesn't apply when you're talking about non-curricular matters. All right, Garcetti, that's not applied to non-curricular matters, Your Honor. That's one of the... There's some circuits that have said... I think we may have hinted in that direction that Garcetti does not apply when we're talking about non-curricular speech or non-curricular matters. And then the response I got was, well, these are just administrative matters that school boards require of teachers all the time, like when they adjourn class or what the seating arrangement is or what have you. But that, of course, differs in kind from what's being done here. Of course. This is much more like Barnett. Administrative matter of having to say the Pledge of Allegiance in the morning, which they found to be compelled speech and unconstitutional, of course. So the question becomes, all right, does the employer itself commission or create the speech that we're talking about here? Does the speech owe its existence to the government employment, which is another way Garcetti expresses it? When I was born, I got a name. My parents gave me that name, not the school. The school didn't commission it. They gave me a nickname. The school didn't create that nickname. My parents did. When I was born, I had a sex. So what if the parents of a particular child came to the school, to the teacher, and asked that the teacher refer to their child by particular pronouns? That would still violate Ms. Polk's religious convictions. She would refer to them by the name that the parents asked. She would refer to the pronouns that the parents asked? To the name. Well, the parents are asking that the child be treated with respect and be referred to by the pronouns that the parents and the child prefer. But she wouldn't do that? She wouldn't do it with the pronouns, Your Honor. She would with the name. I'm just wondering where the limiting principle is on this. How far can discrimination go in the name of religion? Well, we don't see any discrimination here at all, Your Honor. Well, this would be treating particular children in the classroom different than others, even based on what a parent said she would do. She would refer to the transgender children by their names, but would use pronouns with everybody else. So that's treating them unequally. So how far can you go in treating students unequally in the name of religion? I could see this slippery slope toward, well, there's a Muslim student in the class that might offend a Christian teacher's religion, or even using religion to discriminate or treat unequally people of different races. We think the line that she's drawn is very easy to administer. That's the line that you're seeking to draw here, but I'm just concerned about the slippery slope of using religion as a method of treating people unequally. It's the line that her religious beliefs draw, Your Honor. I know. That's my point. Are there instances where, with respect to compelled speech, the school board would have authority if they so chose to tell a teacher what to say? Let's suppose the school board took the, I think we all hold, that this is a course on racial history and everything, and the school board said, we want you to convey something which all of us, I certainly hold it, I think most people hold it throughout society, that racial segregation is abhorrent. And couldn't a school board say to the teacher, we want you to convey the message in the interest of fairness and in the interest of equal treatment of all of our students of whatever race or ethnicity. We want you to say that there be no doubt that racial segregation and racial discrimination and ethnic discrimination is abhorrent. And the school board says, we want the teacher to convey that message and we want it stated explicitly so that there will be no doubt where this school board and where this class and what this entire school system stands for. That's a controversy, maybe controversial, but it's something that 99% of the people, I think a huge number of people in our country believe, that discrimination of any kind and segregation is an abhorrent practice and we want the individual teacher to convey that message. Could the school board do that? As part of the curriculum, they certainly could, Your Honor. But what if the teacher said it was against their religion for some reason? Well, race has a special place. We have a 14th Amendment that handles that, Your Honor. So if it's part of the curriculum of the school, they can do it. What I'm saying is, doesn't the school board have to have some degree of control? Of course they have to have some degree of control. The school board needs to run the school? Well, they set the curriculum. They decide what it is. But this speech that we're talking about here does not owe its existence to the curriculum or to the school board. And I want to make clear that Ms. Polk is not... You think the example I gave was curriculum-related and this is not curriculum-related? That's how I understood your question, Your Honor, yes. You're saying yes to which part of that? It is curriculum-related? As he described it, that's why I understood his question. His question was talking about curricular-related, that they'd be part of the curriculum to talk about... That racial discrimination is abhorrent. That racial discrimination is abhorrent. But this is not part of the curriculum. Let's suppose that message was going to be conveyed in a physics class, that the school board says this is a message we want conveyed throughout the school system, in physics class as well as in other classes. And we just want you to say, look, this is the kind of school system we run. It's one in which discrimination will not be tolerated and racial segregation is absolutely abhorrent. And we want that conveyed explicitly in every classroom, whether it's related to the subject under discussion or not. You can put it up on the wall in every classroom, perhaps. That would be permissible. No, it's not enough to just put it on the wall. You have to say it. If the teacher had a religious objection, which I'm aware of no religious objection to that, but if there were a religious objection, and you're talking about the physics class, and that's the only class we're just talking about, then we'd have a closer case. I think one of the ways we may differ, and I think Judge Thacker's good questions have been probing the point, is I'm not sure I see this as a religious matter. There are many, many secular issues that have a religious component and that people may have religious views about them, but that doesn't detract from what's overall their secular character. And people may have a religious view about one thing or another or another. I can think of an infinite number of things that religion may touch upon, but that doesn't remove them entirely from the secular sphere, does it? Yes, and the opposite's also true, just because it has some secular manifestations does not remove it from the religious sphere. But I just don't see that we can say, oh, well, this is religious in part, it's in the matter. For Ms. Polk, it is religious, and it goes against her religious, sincerely held beliefs. The point I want to make in closing is that she's not trying to say that these gender identity guidelines have to be thrown out the window. The school board has adopted them, so they are the school's guidelines and policy about this, but she thinks they cannot be constitutionally applied to her in certain respects to which she objects. Using the pronouns, which do not accord to the biological sex of the child, and keeping quiet from parents what is happening at school with their children. Thank you, Your Honor. All right, we want to thank you both, and we'd like to come down and greet you, and then we'll move directly into our next case.
judges: J. Harvie Wilkinson III, Robert B. King, Stephanie D. Thacker